Case number 14-1134, Donald L. Koch and Koch Assessment Management, LLC, Petitioners v. Securities and Exchange Commission. Mr. Gorman for the petitioners, Mr. Frieda for the respondent. Mr. Gorman, good morning. Let me just say that we have the fan on because we're trying to cool things off, but we'll all try to speak into the mic if you'll make sure you do. Okay. Thank you, Your Honor. I do hear the fan. I appreciate that. I'll try to speak over the fan so that we don't have a problem. Okay. May it please the Court, my name is Tom Gorman. I have the privilege of representing Koch Asset Management and Donald Koch sitting here in the front row behind me. This case is about one thing really. It's about whether or not an investment advisor who has a long-term track record of placing highly profitable trades for his clients that reach two, three, four hundred percent in returns for these people and has very rigid standards can place the trades here, four separate trades with a valid business purpose and based on a program that Mr. Koch created from his years of advising the Federal Reserve, the Open Market Committee, from his years of being a professor and his years of being a part of that bank and then be charged with manipulation. We submit, Your Honor, that they cannot. There's really four issues here that drive this case, and the first two are really the preeminent ones. First, can the SEC create a new rule of decision for this case on appeal after the trial, after the hearing? Can they create that rule? Second, can they then use that rule to ignore virtually all of the evidence in the record to make their decision and make it based only on their new rule? The third and fourth are similar. The third concerns the standards for primary liability where, again, the SEC disregarded the statutory scheme contrary to the Central Bank. They disregarded the standard that they put in their OIP, and then they created a new open-ended standard, and the final one is exactly the same. That is, can they take a statute passed in 2010, enhance the penalties for Mr. Koch by retroactively applying it to 2009 conduct? We submit that they cannot. We turn first to the primary issue of this case. Can the SEC rewrite the rules? The statutes here are straightforward. It's Section 10B, it's Section 206 of the Advisors Act. The language of the statutes is perfectly clear. The statutes say you have to have scienter, you have to have marketplace deception to have a violation of the statute. There are three decades of Supreme Court decisions starting with Hockfelder, going through Santa Fe, going through Dirks, going through Zanford, which is cited by the SEC, saying those elements have to be here. The SEC tried to fit their case into those. They claim in their opinion that, yes, they admit that those standards apply. They admit there has to be Hockfelder scienter. They admit that there has to be Santa Fe deception. But rather than doing that, what they do is they create a new rule, and I would respectfully direct the Court to page 21 of their opinion, where they create basically a little syllogism. They say basically this. A, you have to have some sort of interference with the markets. That creates an artificial price. And then they quote one of their cases where there's week after week after week of manipulation, the Thomas J. Coharris case. Then they take that and they say if you interfere with it, that will make deception. This is on page 21. That creates deception. Deception violates the statute is the third part of it. Therefore, we have Hockfelder scienter. We have Santa Fe deception. The problem with that is when you scrape it down and look at it and you go to page 27 of their opinion, you find out what they're doing. There they say a priori, not citing a case, not citing the facts. They say a priori reasoning tells us that if you go into the marketplace and you want to have the price higher, you have wrongful intent, and from that wrongful intent when you place a trade, they will presume deception. So without showing anything in the market, without showing anything that's wrong in the intent, because seeking a higher price is not wrong under certain circumstances, they create this based on inductive reasoning. That inductive reasoning is nothing more. Well, don't they argue that what they wanted to do was not just get a higher price but to get a higher closing price just for the sake of having that higher closing price? Do you dispute that? I'm sorry? So do you dispute that, that that's what they found was a violation here, was getting a higher closing price just for the sake of having a higher closing price? What getting a higher closing price here meant, Your Honor, was not manipulating the market. If you look at the conduct, the record's perfectly clear. Every time Mr. Koch said in an email or on the tapes, we want a higher closing price, what happened? Jeff Kristinell, the trader, went and took the price that he picked and put it as the limit order, which was the limitation on how much they would pay for the stock, and that limitation was fitting right inside their program. So it wasn't the market. The conduct here shows that. The undisputed evidence from Kristinell, who was called by the division, is exactly that. That's what they wanted. They wanted that particular price level as the SEC called it, and that's something that happens every day in the marketplace. The Commission's own national market rules, Market Rule 610. Do you dispute the closing price, that pumping up the closing price is properly deemed to be a violation of securities laws? No, Your Honor. You don't dispute that? You accept that someone who was trying to deliberately manipulate the closing price would be violating this? Absolutely, Your Honor. And so you go ahead. If you look at the Commission's cases, the Kocher-Harris case, the Chema case, where they actually did mark the close, those cases are built on day after day after day going into the market and right at the close, pushing up the price. But what does it matter whether it's day after day as opposed to quarter after quarter? It's the pattern, Your Honor. There is no pattern here. There's trades at the end of September. There's trades at the end of December, and that's it. So how long does it matter? Those are the ends of the quarters, right? I'm sorry, Your Honor. Those are the ends of the quarter. Those are the ends of a quarter when the markets tend to be deeper and more liquid, and we have to remember HCBC, one of the stocks here, only trades 20% of the days on the year. The other stocks only trade parts of the days. He's doing this at the end of the quarter, and his compensation, modest compensation from clients, is based on prices at the end of the quarter, right? His compensation is based on prices at the end of the quarter. But he's not seeking best execution. That's pretty clear from the e-mail exchanges and phone conversations, right? Your Honor, that's incorrect. The record here is undisputed that, in fact, they got best execution. The trader who placed every one of these trades testified they got best execution. Each one of the other professionals in this case testified that they got best execution, and the stats bear that out. If you look at the spreads that are on Commission Exhibit 278, which is an internal document from Huntley Securities, it lists the spreads in one column. Jeff Tristanel, the trader, testified that those spreads represent national best price, national best ask. The executions here and the closing price that Coach got in every single instance, with a handful of exceptions on the individual executions, but the individual closing prices all fit right within best execution. You can't, as the SEC said, get best execution and manipulate the market. So there is no real manipulation here. In fact, as Professor Gerald testified, there was basically no market impact at all. When you look at, for example— That's not required, is it, for manipulation? Yes, Your Honor. There has to be some impact in the market. I thought a manipulation or an attempt at manipulation that is otherwise, let's say, undisputed, does not avoid liability because it was unsuccessful. Being unsuccessful doesn't avoid liability, I agree, but there still has to be some impact in the marketplace because you have to violate the statute. The only way that you can violate the statute is if you have scienter, and if there's some marketplace impact. So if you're unsuccessful— I'm sorry? Go ahead, I'm sorry. If you're unsuccessful, clearly you can have an attempt, but you still have to have some impact in the marketplace. So you're saying if you're unsuccessful, then I think that— it sounds like it's contradicting what you said before. You don't have to be successful. Doesn't that mean you don't have to have an effect on the price? No, you have to have some effect in the marketplace. You have to somehow have something that distorts the market price, that creates a false signal, that does something in the marketplace. Isn't that a successful manipulation? That's not successful marking the close. Marking the close is getting the last trade and pushing the last trade higher. If, for example— I understand that, but manipulation is broader than marking the close. That's correct. I thought you said that you needed to have— you were suggesting you needed to have some actual effect on price, and here it didn't. You have to have some effect on the price or some effect on the marketplace, but manipulation ultimately may not be successful. The trader might not make any money, for example. The trader might not succeed in pushing the price so that he could change his margin requirements, which I think was the Kocha-Harris case. The trader might not get exactly what he wants, but here there was no motive at all for this. The commission tries to create one with the fees, which they didn't charge. Then they try to create— Well, what was the disgorgement of $4,000? Was that the fees? The disgorgement was the fees, which turned out to be less than Mr. Kocha refunded to his clients per account. True, true, but irrelevant. It's a very small amount, but the real motive here, Your Honor, was not what was charged. What they charged as the motive was to enhance his reputation. This did not enhance his reputation because if you look at what happened, not only is the statement effect of these numbers so small nobody would see it, but more importantly, Kathleen Marshall testified in the passages about— she is the compliance director at Huntley. She testified that when you went online, which is the whole conversation that started this motive idea, that every day the prices were valued at what the last trade was. So if this was the motive, what the clients would see, for example, take Alice Smith's account. The SEC's statistician testified that High Country closed on August 31st at $10 on her statement. If the next month she saw Mr. Kocha buy it for $20 and then she looked at it on, say, October 15th, she would see it back at $10 and so forth. But if you see this sort of ipsy-dipsy pattern of up and down and up and down and up and down, which is what the clients would see if this was a motive, Mr. Kocha would get more calls than he was worried about. Now his whole concern was that people wouldn't be looking at the long term. As he said in the email to Kathleen Marshall about this particular issue, the point here is I don't want clients looking at the short term. But when they looked at it every day, what they would see is up and down and up and down and up and down. And if he manipulated these stocks the way the SEC says, the pattern would be worse. He would be shooting himself in the foot to make that kind of an arrangement here. The fact of the matter is when you look at the evidence in this case, and it's almost all undisputed, best execution, virtually no market disturbance, best prices around, trades carefully placed in small segments so that they wouldn't disturb the marketplace, there is no evidence of manipulation. And perhaps the shove trade on December 31st is perhaps the poster child for all of this. There, all they did was accept the offer that was made in the marketplace all day. It was one offer. If you look carefully at the communications between the trader and Mr. Kocha, when Mr. Kocha said, wait until the end, pop that one at 905, if you have to, the trader waited. He waited until the end. The spreads have widened. This was right between the spreads. No other offers. He made the buy at 905. One purchase. They did nothing in the marketplace except buy at the only offer that was accepted. It was within the issue of best performance. What about, I think it was High Country. The answer he said, I need it above 2025. Do whatever you need to do to get it above 2025. That's not about purchasing a certain number of shares. That's about driving up the closing price. And his e-mails or phone messages show that he wanted it done right at the close. What do we do with that? Your Honor, there's nothing in those communications that says drive up the price. He says, I want. I need to get it above 20. Yes. 25. 2025, I'm happy. Do whatever you have to do. That seems like it's all about the price, not about the shares. It is all about the price. It is all about the shares. It's all about the. It's not about the shares. It's about the closing price. It's about both, Your Honor, because as the price lathers up, that gives them the opportunity to get the execution. Recall what this is from the trader's point of view. From Mr. Coach's point of view, he's placing a trade for a stock that doesn't trade on 85% of the days of the year. He's placing a trade for a stock that you can almost not purchase. That's so illiquid. Professor Gerald said that it was like a private negotiation to buy the stock. And he says, my limit, as high as I'm willing to spend, is $25. You set that limit at $25. But then what else does he say in those tapes? He says, you trade this in market share 100s and 200s. Don't just send the whole trade down there and display this $25 price to the market. If you need 5,000 shares, do whatever you need to do. 5,000 shares. Right at the close. Then you don't even have time for these other people to come into the market and start selling. You're just bumping up the price at the closing. 5,000 shares. 1,000 to 5,000 is the usual size block that Coach Asset buys. It's right in Mr. Schneider's work. There's no dispute about that. And the 5,000 shares is as many as he wants to buy. And he says, look, if you need more, call me. We'll talk about that. And that's what happened with Chevy. They set that one at 5,000. When they bought 5,000, Mr. Tristanel, the trader, pulled the limitations and they wound up with 6,600 shares of stock. That five, six days before, they couldn't get a share. On the 23rd of December, they tried to buy that stock. They couldn't get it. This is the way that they tried to buy the stock. Take a look closer at September 30th. On September 30th, Mr. Coach was in the market in the morning for High Country. He bought some stock. He had a limit of 18 on that day. That's where he set it initially. He got that stock. Then what did he do? He dropped it. He dropped the limit to 16. Got some stock, couldn't get a fill. Got a partial order. So then he talked to the trader. There's a series of emails about this. And they moved the cap to 25. When they moved it to 25, then they broke the order into little pieces. And they got best execution on every single one of those. And the price lathered up, and they closed out at 23.50. What they did on December 31st is just a replay of this. Mr. Coach tried first at one price. He tried a second price on the 30th of September. Tried to get it cheaper. And then, when they couldn't, they went to the higher price. But they tried to get it cheaper first, and they did get it at best execution. That's what the commission has ignored. If you look at the commission's opinion, they said, Basically, we don't know what to do with Kristinell's testimony about best execution. And they ignored Kathleen Marshall, and they ignored the valid business purpose and the testimony from Mr. Snyder as irrelevant. And they ignored Professor Gerald, basically with some nits and nats picking at his opinion, all of which are wrong. So what they did was they ignored the testimony. They ignored the way these orders were executed. They ignored the markets. And they came to a conclusion based on an a priori presumption. That, Your Honor, they can't do. They can't simply rewrite Santa Fe. They can't rewrite three decades' worth of decisions and then go on. Let me stop you. If anyone doesn't have any questions, we'll give you a couple minutes to reply. Thank you, Your Honor. Mr. Frieda. May it please the Court. I think what Judge Millett was getting at was that there's substantial evidence to support the commission's finding that Coach engaged in the familiar practice of marking the close. You know, all of the arguments he's raised here today were arguments that were raised below and that the commission considered and rejected on the evidence. And the evidence consisted essentially of these e-mails and telephone conversations in which it's very clear that the intent of Coach and Cam was to raise the price of these thinly traded stocks at the end of the quarter in order to apparently inflate the account values for his clients. Every one of these arguments he raised, he raised the deception point. He raised the point about the reasonable best execution point. What do we do with that? What do we do with that? The evidence is that it was best execution. This isn't an ordinary remark. He is the market. I don't know how he's manipulating himself, but essentially he is the market. Some days he was 100 percent of the market. I don't know how he can self-manipulate. And you've got best executions and you've got a strategy that requires enticing people out there to make them actually just want to come sell anything. Well, I mean, as the commission found on the record here, I mean, when he enters the market with the intent to manipulate, to raise the price, that's inconsistent with his duty to- Wait, when you say intent to manipulate to raise the price, you don't mean that, right? You need to raise the price just to get people to come into the market. That's not manipulation, is it? If that were what were going on here, but, I mean, that's not what was going on here. And what was going on here was someone entering the market with the intent to raise the price, and that's market manipulation. That's marketing the clothes. So the fact that-and it wasn't-let me back up for a minute. It wasn't best execution. No, I'm good. He intended to raise the price. He really wanted to raise the price, but he did it at noon rather than 4 o'clock or 3 o'clock, whatever the market closing time was. Would that be a violation? Would that be manipulative if he tried to drive the price up at noon because he wanted to draw people into the marketplace? Well, I mean, I think if he were actually engaged in the strategy of attempting to entice other sellers into the market, that, as the commission said, that may well be a legitimate trading strategy. It's just not what happened here. But that may be. So it's not manipulative just to go in with the intent of raising the price? No. If it's based upon a legitimate trading strategy, no. Okay. So just reacting to your statement. Yeah, no, I get that. His intent to raise the price was what was made it manipulative. Right. But in the context of this case, I think, as the commission reasonably found, when you enter the market with the intent to raise the price at the end of the day in order to set an artificially high closing price, that that's market manipulation. So what if he's the only market? I mean, what market is he? He's the only one buying, it seems like. No, there were other buyers. They weren't trying to get other people to. There were other buyers in the market. And there was other buyers who were getting better prices for their transactions on the same days. On the same days. Yeah. For example, I mean, he drove himself up. The first day that he realized how to do this, or that he figured out that he wanted to, in September, his earlier purchase was at $16. He then told Christianel, okay, try to drive it up to as near as $25 without appearing manipulative. And they purchased at $23.5. And with that one day's trading, he artificially inflated his client's account values by approximately $1 million. So it was not an insignificant amount. But back to the best execution point, specifically with the Christianel testimony. As the commission found, Christianel wasn't very clear on this, because he also testified that they were not trying to purchase the shares at the best price we can. And that was direct testimony from him. He also admitted that they were attempting to mark the close. So I think the commission correctly discounted this testimony. Christianel seemed like somebody who didn't know what he was doing, frankly. Christianel? Yeah. He lost his job, right? He did lose his job. Whatever he did was not consistent with the policies of the house. No. And when it was brought to his attention. It wasn't clear that he even understood that. I think that's true. I think, well, I mean, to gather from the evidence in the record, it appears that once the brokerage came to him with the information about his trading activity, he said, well, actually the quote is, he said, yeah, this isn't even the worst. You should see what we did with Hyatt Country. So, because we came with the information, I think it was from Chevy Yacht. So, yeah. I don't know. But he did fess up. He did come clean about what they were doing, and he testified regarding the parameters of their arrangement. The message to him saying we don't want to appear manipulative, that could be quite a sensible and lawful message, right? Saying, look, here's what we want to do. We understand what the rules are, so do it in such a way that, because, after all, if it can be done without appearing to be manipulative, without being manipulative, so much the better. That, I mean, that may well be true in certain circumstances. And if that were the only statement we had, if that were just a straight remark we had without the trading activity itself, and without the other statements they had, and without Christianel's testimony about what he understood that instruction to mean. It seems to be a cipher. What about Marshall? She knows what she's doing, right? Yes. So what did she say in her report? She said it was market manipulation, I believe. The report, you mean the inside? The inside. Yeah. Yeah, she did. She asked Coach to justify why this shouldn't be considered. Did she ever say they were not getting best execution? Her testimony? I don't recall whether she testified about that. I don't recall it being in the report. Yeah. I mean, the only testimony I recall was Coach's and Christianel's, which, as I said, the commission, I think, reasonably discounted, based upon all of the evidence. And as the commission concluded, I mean, it's inconsistent with your duties to find the best prices reasonably available in the market if you are entering the market to raise the price artificially. Well, I'm not sure if it's true of all of these traits, but in several at least. Wasn't the instruction a sort of laddered approach? I mean, I don't know if it was a laddered approach in the sense that Mr. Coach argues in his brief. I mean, I think the instructions were, you know, here's the amount that I'm authorizing, you know, up to 5,000 shares. Let me know if you need more. But really the focus was on getting the price. So, you know, get it up to 20, 25, and I'm happy, is the quote. Get that one. How is that different from a limit order? Give me 5,000 shares, no more than 25. That's the difference. First executions are laddered at 22. Right. That's the difference, Judge Ginsburg. He didn't say I'd like 5,000 shares with a limit of 25. That's a different type of instruction. Would anything have been different? In the case? Yeah, if he had said that. In the facts of what happened with the executions. I mean, it depends on do we have the other evidence available? I mean, I think the commission conceded that what he was arguing he was doing could be a legitimate business trading strategy depending on the circumstances. But his intent was clear from the conversations and from the e-mail exchanges to artificially raise the price at the end of the day in order to mark the close. So, yeah, it could be a legitimate trading strategy. But it wasn't one here. If he had done everything the same here, you didn't have the e-mails or the audio tapes. Everything was the same. He produced evidence that said, look, this is a very strange and unusually illiquid market. And I'm trying to ladder the price up. And, yeah, I'm going to offer more because it's hard to get these people to let these shares out of their hands. I've got to do something to give them an incentive to come into the market. And, quite frankly, if I do it closer to the end of the day, the word will get out overnight in this illiquid market, and there will be more there for me in the morning. Would that be a violation? I mean, again, that's a tougher case. What's a tougher case? I've just tried to drive the price up at closing. Oh, okay. I'm sorry. But I've done it because I think that's how I can best get people to come into the market, both at that time and the next day, so I can buy the stuff I want to buy. I think there's a line between a legitimate trading strategy and one in which you're attempting to manipulate the market. There's an economic purpose that's reasonable behind the strategy that you've just outlined. But the trading strategy here is contrary to the rational economic purpose. So if I did the exact same thing that I said, and reports will look better, and those clients will quit calling me. So all the same stuff, that's how I'll get this market to move. I want people to sleep on it overnight, so I've got to go at the close. And thank the Lord, it'll make the account values better, and they'll stop bothering me. Now you've gotten down the road of a mixed motive. Yes, I have. Yes. I think in terms of a mixed motive, I mean, there again— The effect on the market is exactly the same. Right, but market manipulation, this is about whether or not you're entering the market with a manipulative purpose. And what that means is if you're entering the market just to implement your legitimate trading strategy, then that's one thing. But if you're entering the market to do something different, to drive up the price in order to achieve the goal of raising your account statement values for your clients, that has a different effect on the market. The market is— And you're finding here he only had one motive? I mean, this seems to me, you know, given his trading strategy and the uniquely illiquid market in which he was operating, that in fact this was a dual motive case, but it wasn't analyzed that way. He's never proved that he actually had a legitimate trading strategy. As the Commission said— Didn't you have the burden of proof? But he—yes, you're right. Okay, so— And the evidence goes the opposite way. He rarely traded at the end of the day before this period of time. He rarely traded—he often traded in the middle of the month, except for— Right, but he said, look, I tried to get these particular stocks at other times and in other ways, and it didn't work. So I just went to when the fission was best, right? And the fission was best at the close of the quarter. But he'd already tried—the records show that he'd already tried to buy these same things at a different time, correct? And it hadn't worked. Right, but you would assume that— Right, you agree that he tried to do it before and it didn't work, and so he went when the fish were biting, in his view. But the Commission reasonably rejected this as being his motive for entering these trades in light of the conversations, in light of the e-mails, and in light of the fact that he really didn't have any evidence to support the claim that he tried to do this— But is it legal error not to address this as a mixed motive case? I don't think so, because I don't think he raised any evidence that was credible to support his claim that it was a mixed motive. I think all of the evidence points to the fact that he entered the market in order to artificially raise the price of securities at the end of the day, which is an open market manipulation similar to what happened in Markowski, and this Court found was a violation of the anti-fraud provisions. In those middle-of-the-month trades, was he always buying? Yes, he was almost always a buyer. Well, if the Court has nothing further— All right, thank you. Thank you. All right, why don't you take two minutes? Thank you, Your Honor. First, Mr. Coach did have a legitimate trading strategy. There was extensive testimony about this from Mr. Snyder. The Commission dismissed it in a footnote as irrelevant. Second, Mr. Christenel's testimony did not say that Mr. Coach wanted to mark the close. There is no statement from Christenel to that effect. In fact, if you look carefully at the cross-examination, or the direct examination, rather, of Christenel, by the Commission, every question was phrased in terms of, do they want to get a price level? Do they want to move the price? There's nothing that says, at the end of the day, end the market. There's nothing that says that it's going to be marked the close. The Commission's counsel is simply wrong. Third, Ms. Marshall did not testify at that hearing that, in fact, this was marking the close. She reported back to the New York Stock Exchange ARCA on a question about why there was end-of-the-day trading that was generated from the Chev trades on December 31st. What she did say is, if there are small executions, as there are here, that, in fact, then you will get the best price. She also said that it would be smart for a trader to bid up in markets like this, in certain circumstances, over the ask in the marketplace, if you want to get a block of stock. And the reason for that is very straightforward. Most of the offers in the market are for 100 to 200 shares. If you want to buy 5,000, 1,000, some block, you're going to have to bid up. And that's exactly what the national market rules of the SEC do. The bottom line here is, this is a legitimate trading strategy. Mr. Koch executed it to make profitable trades for his clients, and he did. The Commission never, ever challenged that. If this rule stands, every trader on Wall Street, every mutual fund that bids up, and they do it every day, and if you look at National Market Rule 610, they give examples of that in the commentary to the rules from 2005. Many traders bid up for business reasons, and it happens every day. That means mutual funds like Fidelity, Vanguard, are going to have to pay more because they won't be able to bid over. They'll have to buy in 1 in 200 share lots. That will drive up the transaction costs and drive up the cost of the stock. That's what Mr. Koch was trying to avoid here. The testimony is undisputed. So there's a valid program. Wait a minute. I thought you were not sure where you were going with the point about the large funds buying. It is that they would drive up the cost for them to be buying in small lots. Correct. So is the result that they don't do it? The result is either they're not going to do it or the clients are going to have to pay more for the securities. Either way, the cost to the clients will increase, and that's one of the reasons the commission wrote National Market Rule 610 that said when you cross the market, meaning when you go over the ask in the marketplace, they don't display those orders to the marketplace, and the commission wrote that rule in 2005. They directed NASDAQ and everybody else to implement it because they didn't want that kind of bidding. They weren't saying it was illegitimate. They just didn't want it to influence the price. Mr. Koch accomplished that here in a different way. Mr. Kristinell testified. He said those markets with the limit orders are only in Huntley's system. That's where you see them. He then broke those orders up into little pieces so the limit cap didn't go down for execution. So it's 100, 200, 300, and you see the executions on the commission's own exhibits. Those executions are all at the valid price in the marketplace. They're all at best execution. That's how they avoided that. Didn't he say at one point, I can't remember which stock it was, that be careful, there's another seller out there, and if he sees what you're doing, he'll flood the market? Yes, Your Honor. How is that consistent with a legitimate trading strategy? If his point is I want to get more shares here that I can buy, I want to entice them out, then why would he say drive up the price but don't let that guy put his shares on the market? Exactly correct, Your Honor. That's a quote from the commission's opinion. That's a piece of that conversation between Kristinell and Mr. Koch. This is, frankly, the reason that we tried to make the transcripts available to make sure that everybody could take a look at what was said there because if you read the rest of that passage, it goes on and it says, that person they're talking about is an OTC market maker who has a duty to maintain an orderly market. He switches sides. Sometimes he buys, sometimes he sells, and in the rest of the passage, they say the market maker will then pick up the stock, meaning buy it, and if he picks up the stock and starts buying it early in the day, the price is going to start to run. If the price starts to run, it may run past the limits of Mr. Koch's program because his program says you can only buy it below tangible book value. It's a value that he puts into the program to protect his clients from paying too much. If it goes too early, that's what will happen. Professor Jarrell, when he testified, said he looked at the markets and he said, the markets imply here on December 31, 2009, that if you had bought early, the prices would have been significantly higher. So that's a good example of exactly why these trades were executed the way they were. That's exactly why the commission's quick portions of those transcripts don't show you actually what's going on. The executions, if you look, just look at the commission's exhibits, 278. They're all in little pieces. They're not the way they're described in the commission's order. The commission describes them as one order after another order after another order, as though they're slamming the clothes all the time. That's not what happened. There's one big order at the top. They break it in little pieces, and then they send the little pieces down, and the little pieces get the executions at the price in the marketplace between the bid and the ask, for the most part, getting you best execution. It was careful execution. It was carefully done, and that's why Professor Jarrell was able to say, no market impact. All right. Thank you. Thank you.
judges: Henderson, Millett, Ginsburg